IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SPHERIX INCORPORATED,

          Plaintiff,

    v.

UNIDEN CORPORATION, and
UNIDEN AMERICA CORPORATION.

          Defendants.

Civil Action No. 3:13-cv-3496

JURY TRIAL DEMANDED

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which Plaintiff, Spherix Incorporated ("Spherix"), makes the following allegations against Defendants Uniden Corporation ("Uniden Japan"), and Uniden America Corporation ("Uniden America") (collectively, "Uniden") based on personal knowledge, the investigation of its counsel, and information and belief:

## PARTIES

1.    Plaintiff Spherix Incorporated is a Delaware corporation, with its principal place of business at 7927 Jones Branch Drive, Suite 3125, Tysons Corner, VA 22102.

2.    Defendant Uniden Japan is a corporation organized and existing under the laws of Japan, with its principal place of business located at 2-12-7 Hatchobori, Chuo-ku, Tokyo 104-8512, Japan.

3.    Defendant Uniden America is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 6225 N. State Highway 161, Suite 300, Irving, Texas 75038-2224.  Uniden America is a wholly-owned subsidiary of Uniden Holding, Inc., a Delaware corporation.  Uniden Holding, Inc., is wholly owned by Uniden Japan.

Uniden America may be served via its registered agent for service of process, Stephanie Liebl, at 4700 Amon Carter Blvd., Fort Worth, TX 76155.

4.      Uniden Japan's principal activities are the design, development, and sale of telecommunications products in and from Japan, including the infringing products identified below.  Uniden America's principal activities are the design, promotion, instruction, sale and distribution of Uniden's products in the Americas, including specifically the United States.

## JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over both Uniden Defendants.  Uniden America's headquarters is in this Judicial District.  Both Uniden Defendants have conducted extensive commercial activities and continue to conduct business within the State of Texas. Both Uniden Defendants, directly or through intermediaries, manufacture, ship, distribute, offer for sale, sell, support, or advertise their products (including, but not limited to, the products and services that are accused of infringement in this lawsuit) in the United States, the State of Texas, and the Northern District of Texas.

7.      Both Uniden Defendants, directly or through intermediaries, have purposefully and voluntarily placed one or more of their products and services (including, but not limited to, the products and services that are accused of infringement in this lawsuit) into the stream of commerce in the Northern District of Texas and elsewhere, including without limitation from and through Uniden's consumer sales website, http://www.uniden.com/, other retail websites, and from and through Uniden's retail distribution network.  Both Uniden Defendants place such

products and services into the stream of commerce with the expectation that the products and services will be purchased by customers in Texas, including in the Northern District of Texas. These infringing products and services have been and continue to be purchased by customers in the Northern District of Texas.  Accordingly, both Uniden Defendants have committed the tort of patent infringement within the State of Texas, and, more particularly, within the Northern District of Texas as alleged in more detail below.

8.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

## THE ASSERTED PATENTS

9.      This lawsuit asserts causes of action for infringement of United States Patent Nos. 5,581,599; 5,752,195; 6,614,899; and 6,965,614 (collectively, the "Asserted Patents").  The inventions disclosed in the Asserted Patents were conceived and created by inventors that were working for an entity within or related to the Nortel corporate family at the time of the invention ("Nortel").  During bankruptcy proceedings several years later, Nortel sold the Asserted Patents to a consortium of technology companies known as Rockstar Bidco, L.P.  Based on a purchase agreement and assignment from Rockstar Consortium US LP, Plaintiff Spherix owns the Asserted Patents, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement.

### UNITED STATES PATENT NO. 5,581,599

10.      On December 3, 1996, the United States Patent and Trademark Office ("PTO") duly and legally issued United States Patent No. 5,581,599 (the "'599 Patent"), entitled "CORDLESS TELEPHONE TERMINAL," to inventors Bruce H. Tsuji, Susan J. McGarry, and Steven W. Sparksman, after a full and fair examination.  A true and correct copy of the '599 Patent is attached as **Exhibit A**.

11.     Spherix is the owner of the entire right, title, and interest in and to the '599 Patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against Uniden.

12.     The '599 Patent is generally directed to technology to coordinate communication and operation of a cordless phone's handset and base.  As set forth in the patent's abstract (reproduced below), the patent teaches core technology that enables a handset to access information and functions on the base:

[57]          **ABSTRACT**

An interactive cordless telephone handset having an alpha-numeric data display system is in radio communication with an associated base station to which voice and data signals are conducted over a telephone line. Received caller identification data is tested for validity and is stored in a limited storage Callers List memory of the base station if found valid. Subsequently, the data is transmitted to the handset over a radio link of limited range, with the received data being formatted and conducted to a display screen for identifying the caller by name and telephone number prior to answering the call. Although caller identification is erased from the display after the call, it is retained in the Callers List memory of the base station where it may be accessed by the handset via softkeys and dedicated dialpad keys for subsequent display and editing and optional transfer to a general directory for long term storage in a nonvolatile memory of the base station.

**UNITED STATES PATENT NO. 5,752,195**

13.     On May 12, 1998, the PTO duly and legally issued United States Patent No. 5,752,195 (the "'195 Patent"), entitled "CORDLESS TELEPHONE TERMINAL," to inventors Bruce H. Tsuji, Susan J. McGarry, and Steven W. Sparksman, after a full and fair examination. The '195 Patent is a continuation of the '599 Patent.  A true and correct copy of the '195 Patent is attached as **Exhibit B**.

4

14.     Spherix is the owner of the entire right, title, and interest in and to the '195 Patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against Uniden.

15.     The '195 Patent is generally directed to technology to coordinate communication and operation of cordless phone handsets and the base.  As set forth in the patent's abstract (reproduced below), the patent teaches core technology that enables a handset to access information and functions on the base:

[57]          **ABSTRACT**

An interactive cordless telephone handset having an alpha-numeric data display system is in radio communication with an associated base station to which voice and data signals are conducted over a telephone line. Received caller identification data is tested for validity and is stored in a limited storage Callers List memory of the base station if found valid. Subsequently, the data is transmitted to the handset over a radio link of limited range, with the received data being formatted and conducted to a display screen for identifying the caller by name and telephone number prior to answering the call. Although caller identification is erased from the display after the call, it is retained in the Callers List memory of the base station where it may be accessed by the handset via softkeys and dedicated dialpad keys for subsequent display and editing and optional transfer to a general directory for long term storage in a non-volatile memory of the base station.

**UNITED STATES PATENT NO. 6,614,899**

16.     On September 2, 2003, the PTO duly and legally issued United States Patent No. 6,614,899 (the "'899 Patent"), entitled "METHOD AND APPARATUS FOR PROVIDING ADVANCED IP TELEPHONY SERVICES IN AN INTELLIGENT ENDPOINT," to inventors Patrick Sollee, Robert Barretto, and Christopher Jessen, after a full and fair examination.  A true and correct copy of the '899 Patent is attached as **Exhibit C**.

17.     Spherix is the owner of the entire right, title, and interest in and to the '899 patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against Uniden.

18.     The '899 Patent is generally directed to technology for data-network-based telephony with intelligent endpoints.  As set forth in the patent's abstract (reproduced below), the patent teaches technology that enables phones to connect to information and functions available on the data network:

(57)            **ABSTRACT**

A method and apparatus in a communications system for providing advanced Internet Protocol (IP) telephony services in an intelligent endpoint. The apparatus and method of the present invention provides a user with the capability to update a local directory from a directory server, perform click to call functions, and perform intelligent processing of incoming calls.

### UNITED STATES PATENT NO. 6,965,614

19.     On November 15, 2005, the PTO duly and legally issued United States Patent No. 6,965,614 (the "'614 Patent"), entitled "METHOD AND SYSTEM FOR COMMUNICATIONS BETWEEN DIFFERENT TYPES OF DEVICES," to inventors Gregory T. Osterhout, James A. Mcalear, and Mark A. Sosebee, after a full and fair examination.  A true and correct copy of the '614 Patent is attached as **Exhibit D**.

20.     Spherix is the owner of the entire right, title, and interest in and to the '614 patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against Uniden.

21.     The '614 Patent is generally directed to methods and systems for communications between various types of devices and network elements, including a gateway providing

communications between primary and peripheral devices.  As set forth in the patent's abstract (reproduced below), the patent teaches technology that enables phones to communicate with peripheral devices on the data network:

(57)                **ABSTRACT**

A communications system includes a packet-based data network coupled to various network elements, including a gateway that provides ports to various peripheral devices. One type of peripheral device includes a Universal Serial Bus (USB) device. A network element coupled to the data network may establish Session Initiation Protocol (SIP) sessions with the gateway. Once a SIP session is established, communications may occur between the network element and the peripheral device. SIP messaging is exchanged between the network element and the gateway. USB commands and data are exchanged between the gateway and the USB device. The gateway converts between the SIP messaging and the USB commands and data.

## FACTUAL BACKGROUND

### NORTEL

22.     All of the inventions disclosed and claimed in the Asserted Patents were originally invented and patented by former Nortel technology employees during the course of their employment.

23.     Nortel's history is inextricably intertwined with the origins of telecommunications.  Alexander Graham Bell invented the telephone in 1874, for which he received a United States patent in 1876 (U.S. Patent No. 174,465) and a Canadian patent in 1877. The Bell Telephone Company (later AT&T) was formed in 1877.  Bell Canada was formed three years later, in 1880.  Nortel was formed as the manufacturing arm of Bell Canada in 1895.  In its early years, Nortel was instrumental in establishing the Canadian telecommunications industry. By the mid-twentieth century, Nortel matured into a global research-and-development powerhouse.

24.     Each of the former Nortel employee-inventors assigned all of their rights in the Asserted Patents to Nortel.

25.     At its peak in 2000, Nortel had grown to more than 90,000 employees (over 35,000 in the United States alone), had a market capitalization of nearly $300 billion, and had yearly revenues approaching $30 billion.  In 2000 alone, Nortel spent nearly $4 billion on research and development with over 25,000 research-and-development employees (nearly 10,000 in the United States alone).

26.     Nortel had offices worldwide, with over 100 locations in the United States alone. Nortel headquartered its United States operations at its 800,000-square-foot complex in this Judicial District in Richardson, Texas (pictured below and on the next page[1]).



---

[1] Available at http://www.bizjournals.com/dallas/news/2011/05/24/nortel-networks-to-sell-richardson-hq.html?s=image_gallery (last visited Aug. 26, 2013).



27.     Nortel was a prolific and disruptive innovator in the telecommunications industry. For example, Nortel was one of the first to envision telecommunications over fiber optics; it led the industry's move to the era of digital telecommunications; it was the first to develop a telephone with the controls in the handset rather than in the base; and it contributed to the development of numerous telecommunications standards and created core technology necessary to implement many of those standards.  From 1992 through 2009, Nortel invested more than $34 billion into research and development.

28.     Nortel's billions, and the inventiveness of the Nortel technology professionals, directly resulted in Nortel receiving well over 6,000 active patents and patent applications covering wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductor, and other telecommunications as of July 2011.  Nortel made patents a priority, and every year Nortel hosted patent award ceremonies at venues such as the Adolphus Hotel in Dallas, and employees received bonuses for their innovations.  Each of the four Asserted Patents issued as the result of the inventiveness of Nortel personnel and Nortel's significant research investment.

## NORTEL'S FORMER EMPLOYEE-INVENTORS

29.     The inventors of the Asserted Patents were Nortel employees at the time they created their inventions and assigned all rights in their patented inventions to Nortel.

30.     Bruce H. Tsuji, Susan J. McGarry, and Steven W. Sparksman, the inventors of the '599 Patent and the '195 Patent, were all part of Nortel's research-and-development efforts based in Canada.

31.     Patrick Sollee, Christopher Jessen, and Robert Barretto, the inventors of the '899 Patent, were members of Nortel's research-and-development group based in Richardson, Texas.

32.     The '614 Patent is the result of a cross-border collaboration among Gregory T. Osterhout, James A. McAlear, and Mark A. Sosebee.  Messrs. Osterhout and Sosebee were part of the Richardson, Texas team, and Mr. McAlear was based in Ottawa, Ontario.

## NORTEL'S BANKRUPTCY AND THE ROCKSTAR CONSORTIUM

33.     Like many companies in the telecommunications industry, the economic and competitive pressures during the 2000s—including competition from manufacturing operations based in China—resulted in Nortel being forced to restructure, contract in size, and eventually enter bankruptcy.  By the end of 2008, Nortel's full-time-employee count had fallen below 30,000, with approximately 10,000 in the United States.  Nortel's revenues had fallen to less than $10 billion, resulting in an operating loss of greater than $2 billion.

34.     Nortel entered bankruptcy protection in 2009.  As part of the bankruptcy, in what has been declared by some as the "M&A Deal of the Year," Nortel sold a portion of its patent assets for an unprecedented and widely-publicized $4.5 billion—which was $1.3 billion more than the combined value of all of Nortel's business units that were sold prior to the patent

auction.  The purchasers were a consortium of leading technology companies collectively known as Rockstar Bidco, LP.  Among the assets sold to Rockstar Bidco, LP were the Asserted Patents.

35.     Nortel's bankruptcy cost more than 30,000 employees their jobs at Nortel, and left others without pension and life insurance coverage.  Employee pensions were slashed in half when Nortel could no longer meet payment obligations.  Some workers lost life insurance or medical benefits when the company's self-funded programs collapsed.

36.     Rockstar Bidco, LP transferred the patents to Rockstar Consortium US, LP ("Rockstar"), an intellectual-property company built on a core of former Nortel technology and business professionals.  Rockstar, based in Plano, Texas, is committed to both advancing innovation through its patent portfolio, and to returning value to its investors that paid more than $4 billion to Nortel—a cash infusion that will help Nortel discharge various debts and satisfy certain financial obligations to its former employees during bankruptcy.

37.     More than two dozen of Rockstar's employees are former Nortel employees, including former Nortel engineers, managers and attorneys.  Some of Rockstar's former Nortel employees were offered other jobs when Nortel collapsed, but turned them down based on the belief that working with Rockstar Bidco was a way to help former Nortel colleagues hurting from the bankruptcy.

### PLAINTIFF SPHERIX INCORPORATED

38.     Spherix Incorporated was launched in 1967 as a scientific research company.  Spherix's common stock trades on the NASDAQ Capital Market system under the symbol SPEX.

39.     Historically, Spherix has focused on biotechnology research and development.  Its research has led to numerous patents and patent applications relating to diverse innovative

biotechnologies such as water purification, biodegradation management, and the use of D-tagatose for food and potentially medical and environmental applications. Spherix continues to work on life sciences and drug development and presently is exploring opportunities in sports and nutritional supplement products relying on its D-tagatose natural sweetener as a GRAS (generally regarded as safe) ingredient.

40.     Spherix presently offers a diversified commercialization platform for protected technologies and has recently expanded into the telecommunications sector. Spherix intends to expand its activities in wireless communications and telecommunication sectors including cordless telephones, cellular, antenna technology, Wi-Fi, and base station functionality. As part of this expansion, Spherix acquired the Asserted Patents (among other IP assets) from Rockstar. Under the terms of the agreement, Spherix acquired the Asserted Patents and related IP and Rockstar received a significant minority stake in Spherix and a share of the Asserted Patents' proceeds, among other consideration.

41.     As a result of its patent acquisition from Rockstar, Spherix has formed a Technology Advisory Board to identify and address market opportunities for innovative technology, including telecommunications technology. The Spherix Technology Advisory Board will be comprised of a number of former Nortel technology professionals, including former Nortel employee-inventors of the Asserted Patents. Part of the purpose of the creation of the Technology Advisory Board is to reward and provide compensation to the inventors of the patents Spherix acquires. Spherix's Technology Advisory Board members will serve as independent consultants and will be provided an opportunity to become Spherix shareholders in exchange for their participation on the Technology Advisory Board.

42.     Spherix is committed to advancing innovation by active participation in all areas of the patent market and draws on portfolios of pioneering technology patents to partner with and support product innovation.  One objective of Spherix's patent licensing and enforcement program is the enforcement of intellectual property developed in North America against large foreign manufacturers that use such IP—without authorization—to make and expand sales of (infringing) systems and methods in the United States and Canada.

### THE UNIDEN DEFENDANTS

43.     Uniden is global leader of cordless phone manufacturing and sales.  Defendant Uniden Japan is a Japanese company with its headquarters in Tokyo, and cordless phone manufacturing facilities in China and Vietnam.  Uniden promotes and sells its cordless phones in the United States through Defendant Uniden America.

44.     For Uniden's fiscal year ending March 31, 2013, Uniden's revenue from cordless phones in the U.S. alone approached or exceeded $100 million.  From September 2007 to the present, Uniden's total revenue from U.S. cordless phones approached $1 billion.

45.     Uniden touts itself as "the largest supplier of cordless telephones . . . in the world."[2]  In the United States, Uniden "has become synonymous with cordless phones in the American market."[3]

46.     Uniden has the second highest U.S. cordless phone market share at approximately 25%.  Together, the two biggest suppliers of cordless phones—Uniden and VTech Communications, Inc.—collect approximately 75% of all U.S. cordless phone revenue.

---

[2] Press Release, Uniden Consolidates Factories in the Philippines (April 21, 1999), *available at* http://www.prnewswire.com/news-releases/uniden-consolidates-factories-in-the-philippines-74150467.html; *see also, e.g.*, http://www.uniden.com.au/australia/oc_our_company.asp (last visited Aug. 29, 2013) ("Uniden is the world's largest manufacturer of wireless communication products and the world's leading cordless phone manufacturer.").

[3] http://www.uniden.co.jp/english/company/activities.html (last visited Aug. 29, 2013).

47.     In addition to Uniden's U.S. phone revenue from sales of Uniden-branded cordless phones, Uniden also makes and sells phones for other brands, including RadioShack. RadioShack resides in this Judicial District.

48.     Uniden has publicly prioritized further consolidating its share of the North American telecommunications market as a key business goal:[4]



49.     Uniden manufactures the cordless phones it sells in the United States at facilities in China and Vietnam, and the phones are subsequently imported into the United States.

**THE ASSERTED PATENTS ARE PIONEER PATENTS COVERING CORE CORDLESS TECHNOLOGY**

50.     The Asserted Patents are pioneer patents.  Each Asserted Patent teaches and claims technology that advanced the state of the art in profound ways.  The core nature of the technology disclosed and claimed in the Asserted Patents is apparent from their early priority dates, as well as how often they have been cited—and continue to be cited—during the prosecution of patent applications filed by telecommunications industry leaders.  Specifically, AT&T, Cisco, CenturyLink, Lucent Technologies, Motorola, Nokia, Panasonic, Samsung, Sanyo, Vonage, Verizon, and VTech—have all cited one or more of the Asserted Patents as prior

---

[4] http://www.uniden.co.jp/english/company/project.html (last visited Aug. 29, 2013)

art relevant to their pending patent applications, or faced PTO examiner rejections of pending claims based on the Asserted Patents, in their attempts to acquire patent protection for follow-on technology that sought to build on Nortel's pioneering work on the core features taught and claimed in the Asserted Patents.

51.     The core nature of the technology taught and claimed in the Asserted Patents is also apparent from how often they have been cited by PTO examiners as a basis for rejecting pending claims in patent applications—including claims pending in patent applications filed by telecommunications industry leaders.  For example, the Asserted Patents have been cited as a basis to reject pending claims in patent applications in no fewer than 81 office actions issued by a number of different PTO examiners.  Moreover, VTech, AT&T, Panasonic, and other industry leaders have each faced multiple PTO examiner rejections of pending claims in later-filed applications based on the core teachings and disclosures of the Asserted Patents.  In addition to the host of rejections issued based on the Asserted patents—which nearly always resulted in narrowing amendments to the rejected claims—at least 15 different patent applications were abandoned after the PTO rejected pending claims in light of one or more of the Asserted Patents. Many of those abandoned applications were filed by leading technology companies, including AT&T, Hitachi, and Nokia.

52.     The '599 Patent, filed in 1993, teaches and claims core technology that today is found in most cordless phones—including Uniden's cordless phone products.  The claimed technology relates generally to enabling access to the information and functions on a cordless phone's base station through the phone's remote handsets.  Such access, for example, can be used to access or edit caller or contact information stored on the base station.

a.  An illustration of the core nature of the technology taught and claimed in the '599 Patent is the fact that it has been cited as relevant prior art during the prosecution of more than 45 later-filed patent applications.  To put that forward citation total in context, the '599 Patent has more forward citations than 67.8 % of all comparable United States patents.  Moreover, many of the more than 45 forward citations to the '599 Patent arose during the prosecution of patent applications filed by leading technology companies.  For example, the '599 Patent was cited during the prosecution of at least 5 later-filed patents assigned to AT&T.  The '599 Patent was also cited during the prosecution of patents assigned to Samsung, Microsoft, Lucent, and Canon.

b.  A further illustration of the core nature of the technology taught and claimed in the '599 Patent is the fact that PTO examiners have cited the '599 Patent in at least 6 different office actions as a basis for rejecting pending claims in patent applications under examination.  In particular, pending claims in a Nokia application were rejected in 4 separate office actions, and ultimately resulted in Nokia abandoning its patent application.

53.  The '195 Patent, filed in 1996, is related to the '599 Patent through a priority claim on the face of the patent.  It teaches and claims comparable technology, namely enabling access to the information and functions on a cordless phone's base station through the phone's remote handsets.

a.  An illustration of the core nature of the technology taught and claimed in the '195 Patent is the fact that it has been cited during the prosecution of more than 57 later-filed patent applications.  To put that forward citation total in context, the

'195 Patent has more forward citations than 96.7% of all comparable United

States patents.  Moreover, the '195 Patent has also been repeatedly cited by

leading technology companies.  In particular, the '195 Patent was cited during the

prosecution of at least two later-filed VTech patent applications, and was also

cited during the prosecution of later-filed patents assigned to Lucent

Technologies, Cisco, Nokia, and Panasonic.

b. A further illustration of the core nature of the technology taught and claimed in

the '195 Patent is the fact that PTO examiners have cited the '195 Patent in at

least 27 different office actions as a basis for rejecting pending claims in patent

applications under examination.  In particular, two different PTO examiners

issued a total of three office actions that cited the '195 Patent as a basis for

rejecting pending VTech claims in two different VTech patent applications.

Moreover, at least 5 patent applications were abandoned after different examiners

issued office actions citing the '195 Patent as a basis for rejecting pending claims.

Specifically, AT&T, NETGEAR, and Microsoft each abandoned patent

applications after receiving PTO office actions that cited the '195 Patent as a basis

for rejecting pending claims.

54.    The '899 Patent, filed in 2000, teaches and claims technology related to data-
network-based telecommunications with intelligent endpoints.  Such technology can, for
example, allow a user to access and select information stored on a data server using an interface
on a handset, or allow a user to download contacts from a cell phone to a cordless phone.

a. An illustration of the core nature of the technology taught and claimed in the '899

Patent is the fact that it has been cited during the prosecution of more than 45

later-filed patent applications.  To put that forward citation total in context, the '899 Patent has more forward citations than 90.2% of all comparable United States patents.  This patent has also been repeatedly cited by industry leaders.  For instance, the '899 Patent was cited during the prosecution of at least 25 later-filed patents assigned to Cisco and at least 9 assigned to Vonage Network.  The '899 Patent was also cited during the prosecution of patents assigned to Nokia, HP, and Samsung.

b.  A further illustration of the core nature of the technology taught and claimed in the '899 Patent is the fact that different PTO examiners have cited the '899 Patent in at least 10 different office actions as a basis for rejecting pending claims in patent applications under examination.  In particular, at least 3 patent applications went abandoned after the applicant received rejections to pending claims citing the '899 Patent—including two applications that AT&T (Bell South and SBC) abandoned.

55.  The '614 Patent, filed in 2000, teaches and claims technology enabling different types of telecommunications devices to communicate with each other.  Such technology can, for example, enable a device based on one network protocol (e.g., Bluetooth) to communicate with a device based on a different network protocol (e.g., DECT).

a.  An illustration of the core nature of the technology taught and claimed in the '614 Patent is the fact that it has been cited during the prosecution of more than 95 later-filed patent applications.  To put that forward citation total in context, the '614 Patent has more forward citations than 99.9% of all comparable United States patents.  This patent has also been repeatedly cited by industry leaders.  For

instance, the '614 Patent was cited during the prosecution of at least 41 later-filed patents assigned to CenturyLink (Embarq Holdings), at least 14 assigned to Cisco, and at least 5 assigned to Verizon.  The '614 Patent was also cited during the prosecution of patents assigned to Motorola, Microsoft, and Nokia Siemens.

b.  A further illustration of the core nature of the technology taught and claimed in the '614 Patent is the fact that PTO examiners have cited the '614 Patent in at least 38 different office actions as a basis for rejecting pending claims in patent applications under examination.  In particular, multiple different PTO examiners cited the '614 Patent as a basis for rejecting pending claims in patent applications filed by Cisco, CenturyLink, and Samsung.  Moreover, at least 6 patent applications were abandoned after the applicant received PTO examiner rejections to pending claims citing the '614 Patent—including applications abandoned by Telcordia Technologies, Matsushita, and Hitachi.

**UNIDEN'S WIDESPREAD INFRINGEMENT OF THE ASSERTED PATENTS**

56.    Uniden's infringement of the Asserted Patents has been and continues to be widespread.  The majority of Uniden's cordless phone revenue from September 2007 to the present is generated from products implementing technology that originated at Nortel and infringe the Asserted Patents.

57.    Nearly all of Uniden's residential cordless phones with base stations utilize the technology claimed in the '599 and '195 Patents.  Most of Uniden's cordless phones also implement network directory functionality as claimed in the '899 Patent.  In addition, Uniden's blue-tooth enabled series of cordless phones implements the very "method and system for communications between different types of devices" claimed in the '614 Patent.

58.     Over the last six years—from September 2007 to the present—***Uniden's U.S. revenue from cordless phones that infringe one or more claims of one or more of the Asserted patents exceeds $785 million***, which is approximately 75% of Uniden's total U.S. cordless phone revenue since September 2007.

59.     Uniden markets its cordless phones by specifically emphasizing technology that infringes the Asserted Patents.  By way of example only, Uniden's United States' website heavily promotes its "Bluetooth CELLLiNK" technology for inter-device communications, which adopts the same technology claimed and taught by the '614 Patent's "Method and system for communications between different types of devices."

60.     The infringing features of Uniden's phones are the basis for customer demand of those phones.  In addition to Uniden's advertising and promotion of infringing features, customer testimonials and other consumer research show that U.S. end-users are motivated to purchase Uniden's phones because of the infringing features contained in those phones.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 5,581,599

61.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 60 above.

62.     Uniden is liable for direct infringement of the '599 Patent pursuant to 35 U.S.C. § 271(a).

63.     Uniden has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '599 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States, certain cordless phones that allow the user to access or control base-station information or functions

through an interface on the handset, including, for example, the D1484, D1660, D1680, D1685, D1760, D1780, D1780-BT, D1785, D1788, D2280, D2380, D3280, D3288, D3580, D3588, DECT3181, DECT3380, WXI3077 series and all other cordless-phone series with remote-directory-access and like capabilities (the "'599-Infringing Phones").

64.     Spherix has suffered and continues to suffer damages as a result of Uniden's infringement of the '599 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from Uniden for its infringing acts.

65.     Unless Uniden is enjoined from further infringement of the '599 Patent, Uniden's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

**COUNT II**

**INFRINGEMENT OF U.S. PATENT NO. 5,752,195**

66.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 60 above.

67.     Uniden is liable for direct infringement of the '195 Patent pursuant to 35 U.S.C. § 271(a).

68.     Uniden has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '195 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States, certain cordless phones that allow the user to access or control base-station information or functions through an interface on the handset, including, for example, the D1484, D1660, D1680, D1685, D1760, D1780, D1780-BT, D1785, D1788, D2280, D2380, D3280, D3288, D3580, D3588,

DECT3181, DECT3380, WXI3077 series and all other cordless-phone series with remote-directory-access and like capabilities (the "'195-Infringing Phones").

69.    Spherix has suffered and continues to suffer damages as a result of Uniden's infringement of the '195 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from Uniden for its infringing acts.

70.    Unless Uniden is enjoined from further infringement of the '195 Patent, Uniden's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

## COUNT III

### INFRINGEMENT OF U.S. PATENT NO. 6,614,899

71.    Spherix refers to and incorporates herein the allegations of paragraphs 1 through 60 above.

72.    Uniden has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '899 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States, equipment enabling phones and other telephony devices to connect to a data network (e.g., DECT, Bluetooth, IP) and access functions or a directory through the network, including, for example, the D1780-BT, D3280, D3580, D3588, DECT3181, DECT3380, DECT4066, DECT4086, DECT4096 series and all other phone series with DECT or Bluetooth access to a directory, or like capabilities (the "'899-Infringing Phones").

73.    Spherix has suffered and continues to suffer damages as a result of Uniden's infringement of the '899 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover

damages in an amount that is no less than a reasonable royalty from Uniden for its infringing acts.

74.     Unless Uniden is enjoined from further infringement of the '899 Patent, Uniden's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

## COUNT IV

### INFRINGEMENT OF U.S. PATENT NO. 6,965,614

75.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 60 above.

76.     Uniden has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '614 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States certain phones that enable connection to a mobile phone, including the D1780-BT, D3280, D3580, D3588, DECT3181 series and all other phone series with CELLLiNK and like capabilities (the "'614-Infringing Phones").

77.     Spherix has suffered and continues to suffer damages as a result of Uniden's infringement of the '614 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from Uniden for its infringing acts.

78.     Unless Uniden is enjoined from further infringement of the '614 Patent, Uniden's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

## JURY DEMAND

79.      Spherix hereby requests a trial by jury in Dallas, Texas pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

80.      Spherix respectfully requests the Court to enter judgment in its favor against the

Uniden Defendants, granting the following relief:

A.      Judgment in Spherix's favor on Counts I, II, III, and IV;

B.      An award to Spherix of damages adequate to compensate it for the Uniden

Defendants' acts of patent infringement, but in no event less than a

reasonable royalty, together with interest and costs as fixed by the Court,

pursuant to 35 U.S.C. § 284;

C.      A grant of permanent injunction, pursuant to 35 U.S.C. § 283 against the

Uniden Defendants, enjoining them from further acts of infringement, or

in the event injunctive relief is unavailable, a lump sum award (in addition

to past damages) based on a reasonable royalty applied to forecasted sales

of infringing products through the expiration date of the last Asserted

Patent to expire;

D.      An award to Spherix of its costs of suit and reasonable attorneys' fees

pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case; and

E.      Any further relief that the Court deems just and proper.

Dated:  August 30, 2013                   Respectfully Submitted:

*/s/ Paul J. Skiermont*
Paul J. Skiermont (Bar. No. 24033073)
G. Donald Puckett (Bar No. 24013358)
Donald E. Tiller (Bar No. 24066197)
Eliot J. Walker (Bar No. 24058165)
**SKIERMONT PUCKETT LLP**
2200 Ross Ave, Suite 4800W
Dallas, TX 75201
Tel:  (214) 978-6600
Fax: (214) 978-6601
paul.skiermont@skiermontpuckett.com
donald.puckett@skiermontpuckett.com
don.tiller@skiermontpuckett.com
eliot.walker@skiermontpuckett.com

***Counsel for Plaintiff Spherix Incorporated***